**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

**Junior Alsept,**

     *Plaintiff,*

**v.**                  **Case No. 3:11-cv-395**
                     **Judge Thomas M. Rose**

**Honda of America Mfg., Inc.,**

     *Defendant.*

---

**ENTRY AND ORDER GRANTING DEFENDANT HONDA OF AMERICA MANUFACTURING, INC.'S MOTION FOR SUMMARY JUDGMENT,** DOC. 21, **AND TERMINATING CASE.**

---

   Pending before the Court is Defendant Honda of America Manufacturing, Inc.'s Motion for Summary Judgment. Doc. 21. Plaintiff Junior Alsept's claims his employment with Defendant Honda of America Manufacturing, Inc. was wrongfully terminated. Because Plaintiff was not otherwise qualified for employment, and because he never formally requested accommodation, and because he was not subject to treatment that would cause one to be forced to resign, Plaintiff's disability discrimination claims fail. Neither do Plaintiff's claims for intentional infliction of emotional distress, negligent hiring, retention and supervision, wrongful discharge, breach of implied contract, and negligence survive the motion.

**I.**   **Background**

1

Plaintiff Junior Alsept worked as a production associate on Line 2 in engine assembly at the Honda Anna Engine Plant from the beginning of his employment in 2002. Alsept depo. at 59. With the downturn in the economy in early 2009, Line 2 was phased out, and the employees who had worked on that line were reassigned to other lines or departments. Finch depo. at 9.2 Alsept was assigned to a new job process on Line 3 in the engine assembly department in June 2009. Id. at 61.

Once he was assigned to his new job, Alsept claims he was harassed by Jeremy Burmeister and John Meinerding. Alsept depo. at 61. According to Alsept, Burmeister "called [him] a mother – mother-effer one day. He looked right at me and said, 'Mother-effer, don't piss me off, Junior. Don't piss me off Junior." Alsept depo. at 62, doc. 22-1 at 7, PageID #981. Alsept also contends that Burmeister started a rumor that Alsept was quitting work to go work at McDonald's, which Alsept claims was humiliating. Alsept. Depo. at 64. Alsept asserts Meinerding joined in on the McDonald's rumor, and repeatedly called Alsept "coach." Alsept depo. at 66, 68.

This treatment so affected Alsept that he needed to take time off of work. Alsept depo. at 63. Alsept has always had paranoid tendencies. Alsept depo. at 41. However, his paranoia reached a new high while dealing with issues at Honda in 2009 and 2010. Alsept depo. at 42-43. Alsept began having increased panic attacks in 2010 when he would attempt to return to work, for fear of being around Meinerding or Burmeister. Alsept depo. at 81, 84-85. Alsept's panic attacks caused him to get flustered, to start sweating, his heart to beat really fast, and to have difficulty breathing. Alsept depo. at 82.

On September 15, 2009, Alsept requested, and Honda granted, a six-week leave of absence due to Plaintiff's diagnosis of depression and anxiety by his psychologist, Dr. Glen Strobel. Caudill depo. at 10; Ex. 1 to same, at HAMALSEPT000103. Over the next year, with the

exception of a few attempts to return to work gradually at the request of Alsept's doctor, Alsept remained on leave. Caudill depo. at 49.

In a letter to Honda Medical Department dated December 7, 2009, Dr. Strobel indicated that Plaintiff was reporting harassment at the hands of his co-workers prior to beginning his leave of absence in September 2009. Ex. 2 to Caudill Depo., Doc. 18-4, at 7.   On January 25, 2010, Alsept spoke with a nurse at Honda requesting a transfer to a different production position. Alsept Depo. at 72-73; Caudill Depo. at 20-21.   Alsept's psychologist wrote a letter to Honda dated September 8, 2010 stating that "[i]f at all possible, Junior is more likely to be successful in his return to work if he returned to work in a new area of the plant." Ex. 5 to Caudill Depo., Doc. 18-4 at 14.

Mike Martin, the business administration coordinator, "was human resources" for the Anna location. Martin depo. at 7.4   He explained in an email that while Alsept's doctor wrote a letter to Honda stating that he should not return to his current department, it was "not a reasonable request, and we would not consider this request," simply because it was not "specific...it has to be in the form of restrictions." Martin depo. at 8-9.   However, he never requested more information from Alsept's doctor, as he perceived it as the purview of the medical department to handle. Martin depo. at 9-10. He further explained that the medical department would look to see if the accommodation could be made within the department, and if not, then there is a plant placement committee to determine if a person could be placed in another position within the plant, followed by a company-wide search. Martin depo. at 15-16.   However, in Alsept's case, nothing was ever done outside the medical department. Martin depo. at 16.   The medical department received a statement from Dr. Tennenbaum, the fitness for duty evaluator, which stated that "if practical...a new job assignment, this would seem reasonable, one concern being that any graduated return to

work program does bring forth curiosity among co-workers." Jackson depo. at 21, Ex. 18, Doc. 18-2, at 7-8.

However, Honda determined that since Alsept would continue to struggle interpersonally, there was no need to look at any different job areas for him. Jackson depo. at 22.   In fact, Carolyn Caudill, the coordinator of the medical department at the Honda Anna plant, testified that "to move somebody from one department to another in the manufacturing area is a lot of work." Caudill depo. at 8-9, 22-23.

Alsept further explained to Emily Scott, a coordinator in charge of leave programs, that he was concerned about returning to work in the same department. Scott depo. at 7-8 and 12.   Scott, however, informed him that at Honda "you're probably not going to be able to get away from a large group. You might want to think about that." Scott depo. at 13.   Instead, she told him that if he wanted a transfer, he would need to come back to work to the same department, and then request an interdepartmental request to transfer through human resources. Scott depo. at 13.

Further, Honda has a program called the Medically Inactive Transition program, or MIT. Martin depo. at 22.   The MIT program is a program when an employee has been off work for six months, which allows the employee to still accrue time with the company, come back to work, and retain all benefits of being an associate, for up to four years in an attempt to return the employee to work. Martin depo. at 22-24.   Alsept would have entered the MIT program on September 27, 2010. Jackson depo. at 14.   Instead of placing Alsept into that program, Honda scheduled a "fitness for duty" evaluation on Alsept, for September 29, 2010 and then chose to return him to work in the same department. Jackson depo. at 16 and 23.   After being told he was to be returned to the same department, however, Alsept did not return to work on September 29, 2010. (Id.; Ex. 21 to Jackson Depo.) After Alsept failed to return. and Honda had left several voicemails inquiring

4

why he had not returned to work (Ex. 21 to Jackson Dep.), Mike Martin of Honda Administration sent Alsept a letter on October 4, 2010 notifying Alsept that he had failed to come to work for three days and that he must contact Martin immediately to discuss the issue. (Alsept Dep. at 75; Ex. J to same.)

At that point Plaintiff called Martin and informed him that he was going to resign his position. (Id.)   Alsept then went to the Anna Engine Plant for an exit interview. (Id.) In response to inquiries from Martin on why he was resigning, Alsept stated that he "was going to move to Florida with a brother." (Id. at 76.)   During the exit interview, Alsept never said that he was unable to perform the fast paced nature of the job or that he was resigning because of harassment by co-workers. (Id.) In fact, in completing the exit interview summary, Alsept instructed Martin to state that the primary reason for resignation was "family related issues," despite the fact that other options such as "couldn't adjust to pace/stress" and "dissatisfied w/work environment/conditions" were listed. (Martin Dep. at 17-18; Exs. 32-33 to same.)   After the interview and Alsept's submittal of a handwritten letter of resignation (Ex. 34 to Martin Dep., Doc. 18-9 at 3), Alsept's employment with Honda ended.

On October 13, 2011, Alsept filed a complaint with the Court of Common Pleas of Shelby County, Ohio, asserting that Honda of America Mfg., Inc., is liable on claims of disability discrimination under Ohio Revised Code §§ 4412.02(A) and 4112.99, interference with the exercise of rights under the Family and Medical Leave Act, 29 U.S.C. §§ 2615 and 2617, religious discrimination in violation of Ohio Revised Code 4112.02, intentional infliction of emotional distress, negligent hiring, retention and supervision, wrongful discharge, breach of implied contract, and negligence.   On November 4, 2011, Honda removed the matter to the United States District Court for the Southern District of Ohio on the basis of federal question jurisdiction. Doc.

1.  On March 8, 2012, Alsept amended his complaint to add a claim under the Americans with Disabilities Act, 42 U.S.C. § 12101. Doc. 11.

Defendant has moved for summary judgment on all claims. Doc. 21.  Plaintiff has responded, opposing summary judgment, with the exception of Plaintiff's Family and Medical Leave Act claim and religious discrimination claim, which Plaintiff admits lack factual support. Doc. 22.  Defendant having replied, doc. 23, the matter is ripe for decision.

## II.    Summary Judgment Standard

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law.  Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323.  The burden then shifts to the nonmoving party who "must set

6

forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255.  If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726.  Rather, credibility determinations must be left to the fact-finder. *Id*.

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

In addition to moving for summary judgment on Plaintiff's federal claim, Defendant is seeking summary judgment on Defendant's claim brought under Ohio law.  In reviewing a claim under Ohio law, this Court must interpret Ohio law consistent with the interpretations of the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc*., 141 F.3d 612, 617 (6th Cir.

1998).   Specifically, this Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the State.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001) (quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir. 1998).   Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. *Id.* (quoting *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994)).

## III.    Analysis

## A.    Disability Claims

The parties agree that Plaintiff's disability discrimination claims under Ohio Revised Code § 4112 can be analyzed under the same standard as applicable under the ADA. Doc. 21 at 9 n.16 (citing *Columbus v. McGlone*, 679 N.E.2d 204, 206-07 (Ohio 1998); and *Jakubowski v. The Christ Hospital, Inc.*, 627 F.3d 195, 201 (6th Cir. 2010)).   Doc. 22 at 6 n.8 (citing *Slane v. Meramateria Partners*, 176 Ohio App. 3d 459 (2008)). Thus, the Court considers these claims together.

## 1.    Hostile Work Environment

In order to maintain an action for a hostile work environment under the ADA, a plaintiff must demonstrate that: (1) he was disabled; (2) he was subject to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment unreasonably interfered with his work performance; and (5) the defendant either knew or should have known about the harassment and failed to take corrective measures. *Trepka v. Bd. of Educ. of the Cleveland City Sch. Dist.*, 28 Fed. App'x 455, 461 (6th Cir. 2002). Hostile work environment harassment "involve[s] repeated conduct and require[s] the plaintiff to demonstrate that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the condition of the victim's employment and create an abusive working environment." *Love v. Elec.*

8

*Power Bd. of Chattanooga*, 392 Fed. App'x 405, 409 (6th Cir. 2010) (internal quotations omitted); *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'").

Plaintiff has no evidence to show that any conduct was of such a severe or pervasive nature as to qualify as harassment under the statute.   The Supreme Court has reasoned that prohibitions on a discriminatory work environment are not meant to create "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80 (1998) As such, the Sixth Circuit has held that repeated reference to an employee affected with major depression as "'looney toon,' 'wacko,' 'crazy,' and 'Rambo'" is nothing more than "name-calling, [which] is not sufficient to create a hostile work environment." *Coulson v. Goodyear Tire & Rubber Co*., 31 Fed. App'x 851, 858 (6th Cir. 2002).   Plaintiff only points to a few incidents from two co-workers: calling him "Coach," which was innocuous, especially in light of the fact that he was coaching a softball team at the time, doc. 22-1 at 7, PageID # 981, and calling him a profanity, which was an isolated incident.

Neither can Plaintiff make a showing that the alleged harassment occurred on the basis of his purported disability. *Trepka*, 28 Fed. App'x at 461 ("Our harassment jurisprudence requires that we distinguish between harassment and discriminatory harassment."). See also *Wasek v. Arrow Energy Servs*., 682 F.3d 463, 467 (6th Cir. 2012) ("the conduct of jerks, bullies, and persecutors is simply not actionable under Title VII unless they are acting because of the victim's gender") (emphasis added).   Here, Plaintiff has failed to make any showing that what he alleges were hostile statements were in any way related to his mental impairment -- a co-worker calling Plaintiff by the nickname "Coach" 10 or more times, a "mother-effer" once, and joking that

9

Plaintiff is leaving his employment to work at McDonald's is wholly unrelated to his claim that he was harassed on the basis of his depression or anxiety. Plaintiff has made no allegation, nor does the record reflect any evidence, that the two alleged harassers were even aware of Plaintiff's depression or anxiety.

Third, even assuming that Plaintiff can show that the alleged conduct was severe, pervasive, and related to his disability, there is no basis to extend liability for co-worker conduct to Honda. The Sixth Circuit has adopted a strict, direct liability standard before an employer is liable for co-worker harassment:

> When the harasser is a co-worker, the standard for determining employer liability is markedly different from that applicable to supervisors, and is not based upon the doctrine of respondeat superior. As discussed above, the employer's liability in cases of co-worker harassment is direct, not derivative; the employer is being held directly responsible for its own acts or omissions. . . . When an employer responds with good-faith remedial action, we cannot say that the employer has itself committed an act of discrimination. . . .

*Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 873 (6th Cir. 1997).

Plaintiff states that the alleged harassment came only from two co-workers on the assembly line. (Alsept Dep. at 61.) In each instance, Plaintiff failed to report the alleged harassment to Honda, despite the various channels and opportunities to do so. In only two instances did Honda supervisors or administration learn of Plaintiff's concerns, and only when Plaintiff was specifically questioned. Each time, Honda responded by investigating or ensuring that the unwelcomed conduct would cease.

Based on the limited number of allegations of harassment that Honda was actually made aware of, and due to Honda's good faith response to investigate and respond in an appropriate manner, even in the absence of Plaintiff's cooperation, there is no basis to extend liability to Honda for Plaintiff's disability harassment claim.

10

2.      **Constructive Discharge**

"In order to maintain an action for constructive discharge, [a plaintiff] must show that working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Kocsis v. Multi-Care Mgmt*., 97 F.3d 876, 887 (6th Cir. 1996).   To determine whether that standard is met, courts consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status. *Logan v. Denny's, Inc*., 259 F.3d 558, 569 (6th Cir. 2001).   Only one of these seven is even arguably in play, and that one, "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation," allegedly consists of only a few incidents, absent any evidence of calculation.   Cf. *McKelvey v. Secretary of U.S. Army*, 450 Fed. App'x 532, 535 (6th Cir. 2011) ("Repeated over the course of nine months, this constant stream of invective could sustain a finding of constructive discharge. It is 'sever[e]' and 'humiliating,' not a collection of 'mere offensive utterance[s].'")   Plaintiff has affied that he was subject a very small collection of utterances, some of them facially inoffensive.

Moreover, when an employee alleges constructive discharge, "the employee's perception must be judged objectively without consideration of his undue sensitivities." *Wilson v. Firestone Tire & Rubber Co*., 932 F.2d 510, 515 (6th Cir. 1991).   Therefore, to establish constructive discharge, a plaintiff must show more than the existence of a hostile work environment to prove constructive discharge. *Winfield v. Gates*, 2010 WL 5014497 *6 (S.D. Ohio Dec. 3, 2010) ("[t]he plaintiff must show more than a Title VII violation to prove constructive discharge, so the fact that

11

plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also."); *Mohammed v. Penske Logistics*, 2006 WL 2468280, \*6 (S.D. Ohio Aug. 24, 2006) ("The plaintiff must show more than a Title VII violation to prove constructive discharge.") Therefore, because Plaintiff has not made the requisite showing to establish a hostile work environment, he necessarily fails to make the elevated standards necessary to establish the elements of constructive discharge.  Further, to succeed on a constructive discharge claim, an employee must show that an employer acted intentionally and with the intent for the employee to resign. *Lee v. City of Columbus*, 2009 WL 2525143, \*10 (S.D. Ohio Aug. 13, 2009) ("unlike the more common adverse actions, [constructive discharge] requires proof of intolerable working conditions and proof of the employer's intention to force resignation").

Plaintiff has provided no evidence that Honda intended to force Plaintiff to resign his employment.   To the contrary, throughout Plaintiff's leave, Honda was making proactive efforts to help Plaintiff return to work by accommodating Plaintiff's leave for over a year and repeatedly enrolling Plaintiff in a gradual return to work program to facilitate his successful return. (See Caudill Dep. at 49; Ex. 14 to same at HAMALSEPT00194.) Even when Plaintiff failed to report to work at the end of his leave, Honda medical called him repeatedly in an effort to discover why he was not reporting to work (see Ex. 21 to Jackson Dep.) and human resources sent Plaintiff a letter requesting he contact them immediately because of his failure to return to work. (Alsept Dep. at 75; Ex. J to same.) Honda's efforts to return Plaintiff to work only ended after Plaintiff voluntarily resigned, telling a fictitious story of going to live with a brother in Florida.

**3.**     **Failure to Accommodate**

In order to establish a *prima facie* case of failure to accommodate an alleged disability, a plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) he is otherwise

12

qualified for the position, with or without a reasonable accommodation; (3) the employer knew or had reason to know about the employee's disability; and (4) the employer failed to provide the necessary accommodation. *Johnson v. Cleveland City School Dist.*, 443 Fed. App'x (6th Cir. 2011).   At best, Plaintiff can only point to requests that he not return to his current department, citing either to the "fast-paced" nature of the job, or his unhappiness with undesirable co-workers. However, Plaintiff's claim necessarily fails because (1) he is not a "qualified individual," (2) he never submitted a request for an accommodation, and (3) Plaintiff's request to be moved away from certain co-workers is unreasonable as a matter of law.

Plaintiff's failure to accommodate claim necessarily fails because he is not a "qualified individual" under the ADA, as evidenced by Plaintiff's application for and receipt of Social Security Disability benefits.   An employee is "qualified" for the job only if he can perform the essential functions of that job, with or without reasonable accommodation. 42 U.S.C. § 1211(8). "An individual who cannot perform the essential functions of a job is not qualified and, in such cases, the ADA does not come into play." *Dietelbach v. Ohio Edison Co.*, 1 Fed. App'x 435, 437 (6th Cir. 2001).

Plaintiff's depression made him unable to perform necessary job functions regardless of whether or not he was given an accommodation by Honda.   When Plaintiff was on leave, he applied for Social Security Disability in January 2010, for which he began receiving benefits in March 2010. (Alsept Dep., at 29; Ex. G to same.)   A person qualifies for Social Disability upon a showing that he can show that he cannot "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Therefore, Social Security Disability is directly relevant to whether an employee is able to perform essential functions of a job -- i.e., whether the employee is a "qualified individual." See

*Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 798 (1999) ("an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work.  To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could 'perform the essential functions' of her previous job, at least with 'reasonable accommodation.'"); *Finnicum v. Evant, Inc.*, 1999 WL 357794, *3 (6th Cir. May 17, 1999). Plaintiff does not explain how his Social Security Disability claim and ADA position that he was able to perform the functions of his job if he were reassigned are consistent.  It would seem for Social Security purposes that any other employer would offer him the accommodation of different co-workers.

The contents of Plaintiff's SSA application support that he was not a qualified individual in January 2010, as he stated that "doing anything is a hard task," he doesn't go out much because he is paranoid and "feel[s] everyone is watching me," and "get[s] nervous and anxiety about people." (Ex. H to Alsept Dep.) In addition, the vocational specialist that reviewed Plaintiff's application stated that agreed that he "is unable to perform the mental demands of unskilled work activity." (Ex. I to Alsept Dep.) Even Plaintiff agreed that, due to his disability, "I don't think I could go back to work." (Id. at 56.) Moreover, Plaintiff testified that the condition that made him unable to work first surfaced in August 2009 (Alsept Dep. at 37.)  Based on Plaintiff's application for Social Security Disability, and by his own admission, Plaintiff was unable to work in January 2010, and therefore was not a "qualified" individual under the ADA.

Moreover, Plaintiff's demands do not constitute requests for accommodation under the ADA.  The ADA does not permit a disabled employee to dictate the terms of his employment by state that he no longer desires to work in a position, only to bring suit when that demand is not met. See *Hankins v. Gap, Inc.,* 84 F.3d 797, 800-01 (6th Cir. 1996) (rejecting an employee demanding a

14

transfer as the only reasonable accommodation because "an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided.") To the contrary, an employee submits restrictions or limitations and the employers provide the reasonable accommodation. *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 871 (6th Cir. 2007) ("The purpose of this process is to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.")

Plaintiff never requested an accommodation. Because an employee's disability and concomitant need for accommodation are often not known to the employer until the employee requests an accommodation, the ADA's reasonable accommodation requirement usually does not apply unless "triggered by a request" from the employee. *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001) (citing Henry Perrett, Jr., 1 *Americans With Disabilities Act Handbook*, § 4.17, at 121 (3d ed. 1997)). The employee's request must be "sufficiently direct and specific," giving notice that she needs a "special accommodation." *Id.* At the least, the request must explain how the accommodation requested is linked to some disability. *Id.*

Here, what Plaintiff identifies as a request for accommodation -- the request to be moved away from certain co-workers -- is not a reasonable accommodation. An employee request seeking a transfer away from a particular person is per se unreasonable. *Coulson*, 31 Fed. App'x at 858 (finding request to transfer "so that [a plaintiff] will not be required to work with certain people. . . . would be asking the court to establish the conditions of his employment, most notably with whom he will work."); *Schwarzkopf v. Brunswick Corp.,* 833 F. Supp. 2d 1106, 1123 (D. Minn. 2011) ("asking for a transfer to avoid certain co-workers is not a request for a reasonable accommodation"). Therefore, Plaintiff's failure to accommodate claim fails as a matter of law and Honda is entitled to summary judgment.

15

**B.      Intentional infliction of Emotional Distress**

Plaintiff alleges that Honda intentionally inflicted emotional distress upon him. (Compl. at ¶ 25.)   Liability for intentional infliction of emotional distress "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" and "liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Yeager v. Local Union 20*, 6 Ohio St. 3d 369, 375 (1983). The "beyond all possible bounds of decency" standard required to establish an intentional infliction of emotional distress claim is more stringent than the showing necessary to make a claim for a hostile work environment. *Godfredson v. Hess*, 173 F.3d 365, 373 (6th Cir. 1999) ("an employee's termination, even if based upon discrimination, does not rise to the level of 'extreme and outrageous conduct' without proof of something more"); *Roush v. KFC Nat'l Management Co.*, 10 F.3d 392, 401 (6th Cir. 1993) (conduct constituting a hostile work environment was not sufficient to establish an intentional infliction of emotional distress claim); *Mowery*; 2006 Ohio 1153, at ¶ 51 ("evidence sufficient to submit a hostile work environment claim to a jury does not necessarily also suffice to require submission of an intentional infliction of emotional distress claim to a jury").   In order to establish "serious" or "severe" emotional distress, a plaintiff must show that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress generated by the circumstances of the case." *Reynolds v. Wingers, Inc*., 621 N.E.2d 1239, 1243 (1993).

Plaintiff has described no conduct that arises to the level of a hostile work environment, let alone that would go "beyond all possible bounds of decency."   In the two instances where Honda learned of Plaintiff's issues with his co-workers, Honda reacted appropriately and in good faith by

16

investigating and taking reasonable steps to stop the behavior in question.  The instance of profanity Plaintiff describes might be nearly universally disapproved, but is not, standing alone, beyond all possible bounds of decency.   Accordingly, Honda is entitled to summary judgment on Plaintiff's intentional infliction of emotional distress claim.

## C.      Negligent Hiring

Plaintiff alleges that Honda engaged in negligent hiring, retention, and supervision of various supervisors of Plaintiff. (Compl. at ¶¶ 28-32.) Under Ohio law, to prove this claim, a party "must prove (1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining [or supervising, etc.] the employee as the proximate cause of plaintiff's injuries." *Shoemaker-Stephan v. Montgomery County Bd. of Comm'rs*, 262 F. Supp. 2d 866, 886-87 (S.D. Ohio 2003).   As an underlying requirement for bringing a negligent retention claim "a plaintiff must allege and prove that the incompetent employee is individually liable to the plaintiff for a tort." *Minnich v. Cooper Farms, Inc*., 39 Fed. App'x 289, 295-96 (6th Cir. 2002); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Wuerth*, 122 Ohio St. 3d 594 (2009).   Plaintiff has made no showing that any Honda employee is individually liable to him in tort.[1]   Therefore, Honda is entitled to summary judgment on Plaintiff's negligent hiring, retention, and supervision claim.

## D.      Wrongful Discharge

---

[1] Plaintiff counters by asserting that *Hidy Motors, Inc., v. Sheaffer*, 2009 Ohio 3763 at ¶ 38 (Ohio App. 2009), stands for the proposition that harassment is *per se* actionable, ignoring that the "harassment" that the case refers to as *per se* incompetent behavior, is a tort, the tort of age harassment.   Plaintiff here has no evidence of a tort committed against him by co-workers.

Plaintiff alleges that he was wrongfully discharged in violation of Ohio's public policy "that employees should not be retaliated against for reporting workplace safety issues." (Compl., ¶36.)  Specifically, Plaintiff alleges that his reporting of workplace safety issues was that "his psychologist reported serious concerns about Plaintiff's workplace safety related to habitual harassment and bullying to the Coordinator." (Id. at ¶ 34.)

To establish his wrongful termination in violation of public policy claim, Plaintiff must demonstrate that (1) there is a clear public policy manifested in the state or federal constitution, statute, or administrative regulation, or in common law; (2) dismissing employees under circumstances like those involved in this case would jeopardize that public policy; (3) dismissal was motivated by conduct related to that public policy; and (4) the employer lacked an overriding business justification for dismissal. *Abrams v. Am. Computer Tech*., 168 Ohio App. 3d 362, 371 (Ohio App. 2006).   The public policy exception to the employment at-will doctrine is construed narrowly. *Painter v. Graley*, 70 Ohio St. 3d 377, 384 (1994) ("an exception to the traditional doctrine of employment-at-will should be recognized only where the public policy alleged to have been violated is of equally serious import as the violation of a statute"); *Mitchell v. Mid-Ohio Emerg. Sers., LLC*, 2004-Ohio-5264, at ¶ 20 (Ohio App. 2004) (to extend the public policy exception too far would undermine the notion that employees are terminable at will).

Plaintiff's claim fails for the same reason he has not made a showing that he was terminated by Honda because his constructive discharge claims fails. *Keller v. Allstate Ins. Co.*, 146 Fed. App'x 764, 766 (6th Cir. 2005) ("Without a showing of circumstances supporting a factual issue regarding Keller's claim of constructive discharge, no discharge exists to support Keller's wrongful-discharge claim, and it too fails.")  Because he voluntarily resigned, Plaintiff cannot maintain a claim for wrongful termination.

Second, the record does not reflect that Plaintiff, through his psychologist, submitted a workplace safety issue to Honda.   The communications from Plaintiff's psychologist to Honda consisted of two letters: one stating Plaintiff "has been intimidated and called names by some of his co-workers" (Caudill Ex. 2), and the other stating "Junior is more likely to be successful in his return to work if he is returned to work in a new area of the plant." (Caudill Ex. 5.)   These are not instances where a whistleblower is terminated for reporting a *bona fide* workplace safety issue. C.f. *Kulch v. Structural Fibers, Inc.*, 78 Ohio St. 3d 134 (1997) (employee fired for reporting workplace safety issue to OSHA).

Third, Plaintiff can make no showing that any wrongful conduct of Honda occurred because of the "workplace safety" report by this psychologist.   Plaintiff stated that the entirety of the alleged harassment and hostile work environment occurred between June and September 2009 (Alsept Dep. at 90) -- prior to Plaintiff taking leave and any letter to Honda reporting a "workplace safety" issue.   In addition, as described above, Plaintiff was not entitled to a requested transfer and the refusal to grant such a transfer is not an adverse employment action that could have led to a wrongful termination.   Accordingly, Honda is entitled to summary judgment on Plaintiff's wrongful discharge claim.

## E.        Breach of Implied Contract

Plaintiff alleges that Honda breached an implied employment contract with him.   In support of his allegation, Plaintiff makes reference to "an implied contract for employment . . . in Defendant's Associate Handbook." (Compl. at ¶ 39.) Clear evidence of an employment contract is required before abandonment of the "employment-at-will" doctrine. *Belt v. Broadway Express, Inc.*, 83 Ohio App. 3d 706, 709 (Ohio App. 1992)

As a matter of law, Honda's Associate Handbook does not constitute a contract of employment. *Stanley v. Honda of Am. Mfg.*, Case No. 17-94-20, 1994 Ohio App. LEXIS 5668, 9-10, (Ohio App. Dec. 13, 1994) ("The party asserting the existence of an implied contract carries the heavy burden of proving the existence of each element necessary to the formation of a contract. Absent mutual assent, a handbook becomes merely a unilateral statement of rules and policy which creates no obligations and rights.") (internal citations omitted); *Shockey v. Honda of Am. Mfg., Inc.*, Case No. 14-90-27, 1991 Ohio App. LEXIS 3583, *4-5 (Ohio App. July 24, 1991) ("we find nothing in [Honda's Associate Handbook] that either expressly or impliedly limited the [employer]'s right to terminate appellant for any cause or no cause at all.")

Here, Plaintiff fails to refer to any provision within the Associate Handbook that would create an implied contract.  Even assuming that an implied contract existed that "Plaintiff would only be terminated for just cause," Honda never violated that alleged contractual provision because Plaintiff was not terminated, he voluntarily resigned.  Therefore, Honda is entitled to summary judgment on Plaintiff's breach of implied contract claim.

## F.     Negligence

In his Eighth Claim, Plaintiff makes a general and conclusory negligence claim. (Compl. ¶ 43-45.) To prove negligence under Ohio law, Plaintiff "must show the existence of a duty, a breach of the duty, and an injury resulting proximately therefrom." *Menifee v. Ohio Welding Products, Inc.*, 472 N.E.2d 707, 710 (Ohio 1984).   Plaintiff alleges that Honda was negligent by subjecting him to a hostile work environment, constructively discharging him, and failing to accommodate his request for a transfer.  As discussed above, Honda has not breached any such duty. Therefore, Honda is entitled to summary judgment on Plaintiff's negligence claim.

## IV.    Conclusion

Because Plaintiff was not otherwise qualified for employment, and because he never formally requested accommodation, and because he was not subject to treatment that would cause one to be forced to resign, Plaintiff's disability discrimination claims fail.  Neither do Plaintiff's claims for intentional infliction of emotional distress, negligent hiring, retention and supervision, wrongful discharge, breach of implied contract, and negligence survive the motion.  Therefore, Defendant Honda of America Manufacturing, Inc.'s Motion for Summary Judgment, Doc. 21, is **GRANTED** and the instant case is **TERMINATED** on the docket of the United States District Court for the Southern District of Ohio at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, June 3, 2013.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE